## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

BUSH TRUCK LEASING, INC.,                    Case No. 1:20-cv-511
      Plaintiff,                              Dlott, J.
                                             Litkovitz, M.J.
    vs.

ALL WAYS AUTO TRANSPORT, LLC,                **REPORT AND**
      Defendant.                              **RECOMMENDATION**

Plaintiff Bush Truck Leasing, Inc. (BTL), initiated this breach of contract action on July

1, 2020 against defendant All Ways Auto Transport, LLC (AWA).  (Doc. 1).  AWA filed its

answer, affirmative defenses, and four counterclaims against BTL on September 21, 2020.  (Doc.

9).  This matter is before the Court on BTL's motion to dismiss all of AWA's counterclaims

(Doc. 16), AWA's response (Doc. 19), and BTL's reply (Doc. 20).

### I.      Background[1]

BTL is an Ohio corporation that finances and leases vehicles for business purposes to

independent contractors.  AWA is an Illinois limited liability company that uses a network of

independent contractor truckers to deliver products to its customers.  The parties executed a

Program Agreement on November 4, 2016.  AWA alleges that it executed the Program

Agreement based on a series of oral and written representations by BTL that it had a

comprehensive maintenance program (including preventative maintenance) (hereafter,

maintenance-related representations).  (*See* Doc. 9 at PAGEID 45-49; Docs. 9-1 to 9-2 at

PAGEID 57-82).  AWA further alleges that BTL knew that the maintenance-related

representations were false.  (Doc. 9, PAGEID 45 at ¶ 5).  AWA alleges that the maintenance-

---

[1] The Court derives the information contained in this section from AWA's answer and counterclaims (Doc. 9) and
the attached Program Agreement (Doc. 9-5).

related representations, together with the Program Agreement, comprise the overarching agreement at issue between the parties (Contract). (*See id.*, PAGEID 52 at ¶ 31).

According to the Program Agreement's recitals, AWA's purpose in entering into that agreement was "to facilitate the financing and/or leasing by Independent Contractors[2] of Delivery Vehicles[3]. . . ." (Doc. 9-5 at PAGEID 97). AWA agreed that it would "exclusively refer any and all existing or prospective Independent Contractor requiring financing or leasing of a Delivery Vehicle to BTL" and that BTL would have "first right of refusal to provide financial or leasing for all such Independent Contractors." (*Id.* at ¶ 1). AWA also agreed to:

> either (i) endorse BTL's maintenance program for all of its Independent Contractors requesting financing from BTL, or (ii) contractually require that its Independent Contractors receive written prior approval from BTL to use an alternative program for the maintenance of Delivery Vehicles during the term of each Independent Contractor's financing or leasing agreement with BTL.

(*Id.* at ¶ 2). AWA also assumed certain obligations in the event that its Independent Contractors defaulted under financing agreements with BTL for Delivery Vehicles. In particular, AWA agreed that, in the event of a default and resulting repossession of a Delivery Vehicle, "[a]ny repairs required by BTL to bring a Repossessed Delivery Vehicle[4] to acceptable condition, in BTL's sole discretion, normal wear and tear excepted, shall be the responsibility of and paid by [AWA]." (*Id.*).

AWA argues that BTL's failure to follow through on its maintenance-related representations caused AWA significant damages in the form of (1) lost revenue when its Independent Contractors were sidelined by delayed repairs; (2) monies AWA advanced to its

---

[2] This term refers to independent contractors working for AWA. (Doc. 9-5 at PAGEID 97).

[3] This term refers to "one or more trucks and or trailers meeting [AWA's] requirements and specifications for delivery of certain products[.]" (*Id.*).

[4] This term refers to Delivery Vehicles repossessed under ¶ 4 of the Program Agreement following a "default by an Independent Contractor under a financing agreement with BTL. . . ." (*Id.*, PAGEID 98 at ¶ 4).

Independent Contractors for repairs and lease payments owed to BTL; (3) the loss of quality Independent Contractors, who quit as a result of BTL's subpar maintenance program; and (4) the costs of replacing such Independent Contractors.

AWA brings four counterclaims against BTL. First, AWA alleges that the execution of the Program Agreement was based on fraud. Second, AWA alleges that the maintenance-related representations made by BTL are a part of the parties' overarching Contract, and BTL's failure to perform consistent with those representations therefore constitutes a contractual breach. Third, in the alternative, AWA alleges that BTL was unjustly enriched in the form of the funds AWA advanced to its Independent Contractors for leases and repairs while they were sidelined from driving due to BTL's lack of a functional maintenance program. Finally, AWA alleges that BTL's maintenance-related representations violated Ohio's Deceptive Trade Practices Act (ODTPA).

## II.    Standard of law

In deciding a motion to dismiss under Rule 12(b)(6), the Court must accept all factual allegations as true and make reasonable inferences in favor of the non-moving party. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012) (citing *Harbin-Bey v. Rutter*, 420 F.3d 571, 55 (6th Cir. 2005)). Here, the Court therefore accepts the counterclaimant's (AWA's) factual allegations as true and construes the counterclaims in favor of AWA. *See United Food & Com. Workers Union-Emp. Pension Fund v. Rubber Assocs., Inc.*, 812 F.3d 521, 524 (6th Cir. 2016) (citation omitted) (setting forth the motion to dismiss standard in the context of a counterclaim). Only "a short and plain statement of the claim showing that the pleader is entitled to relief" is required. *Keys*, 684 F.3d at 608 (quoting Fed. R. Civ. P. 8(a)(2)). "[T]he statement need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Id.*

(quoting *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)) (internal quotation marks omitted) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  Although the plaintiff need not plead specific facts, the "[f]actual allegations must be enough to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 555, 570).  A plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

## III.   BTL's motion to dismiss

### A.  Breach of contract[5]

BTL begins with AWA's breach of contract counterclaim.  The parties do not dispute that the maintenance-related representations are not included in the parties' written Program Agreement.  The dispute, rather, is whether the maintenance-related representations are otherwise part of an overarching contract between BTL and AWA (i.e., the Contract alleged by AWA).  (*See* Doc. 9, PAGEID 52 at ¶ 31).

BTL first argues that AWA "has not alleged and cannot point to any obligation in the Program Agreement that BTL failed to perform. . . ."  (Doc. 16 at PAGEID 138).  BTL argues that the maintenance-related representations contradict the terms of the Program Agreement because the Program Agreement imposes *no* maintenance obligations upon BTL.  Second, BTL argues that AWA's allegations pertaining to the maintenance-related representations are barred by the parol evidence rule because the Program Agreement is fully integrated.  Even if the

---

[5] In its response, AWA makes a cursory reference to the fact that it was a third-party beneficiary to maintenance agreements between its Independent Contractors and BTL.  (*See* Doc. 19 at PAGEID 169-70).  AWA's counterclaims, however, make no mention of such a claim.  The Court therefore declines to address this perfunctory argument, which is not tied to any allegation in AWA's counterclaims.  *Cf. Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013) ("This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived.") (citation omitted).

4

Program Agreement were not fully integrated, BTL argues, AWA seeks to introduce parol evidence that is both (1) inconsistent with and (2) the natural subject of the Program Agreement. Finally, BTL argues that the maintenance-related representations do not amount to an enforceable oral agreement.

AWA argues that the parties' Contract contained both written and oral terms (i.e., the Program Agreement and the maintenance-related representations). AWA argues that parol evidence may be considered because the Program Agreement was not fully integrated. AWA points to the lack of an integration clause[6] and multiple references to maintenance in the Program Agreement as demonstrating that the Program Agreement was not fully integrated. Finally, AWA argues that, because the maintenance-related representations did not form a *separate* contract (only part of the overarching Contract alleged), the defects in the traditional breach of contract elements that BTL raises are irrelevant.

"Under Ohio law, the elements of a breach of contract claim are: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff as a result of the breach." *V & M Star Steel v. Centimark Corp.*, 678 F.3d 459, 465 (6th Cir. 2012) (citations omitted). In addition to what comprises the parties' contract in the first place, the parties dispute whether AWA has sufficiently pleaded element three: a breach of the parties' agreement. AWA alleges that BTL breached its maintenance-related representations that were not contained in the written Program Agreement but that were part of the parties' overarching Contract.

AWA's position depends on the Court's consideration of evidence extrinsic to the written Program Agreement. Such evidence is subject to the parol evidence rule. The parol evidence

---

[6] "[T]he absence of an integration clause does not preclude a finding that all or part of a contract is, in fact, an integrated writing. . . ." *Bellman v. Am. Internat'l Grp.*, 865 N.E.2d 853, 857 (Ohio 2007).

rule is a rule of substantive law providing that "absent fraud, mistake or other invalidating cause, the parties' final written integration of their agreement may not be varied, contradicted or supplemented by evidence of prior or contemporaneous oral agreements, or prior written agreements." *Galmish v. Cicchini*, 734 N.E.2d 782, 788 (Ohio 2000) (quoting 11 Williston on Contracts (4th ed. 1999) 569-70, Section 33:4). The rule's purpose is "to protect the integrity of written contracts[,]" *id.* at 789 (citing *Ed Schory & Sons, Inc. v. Soc. Nat'l Bank*, 662 N.E.2d 1074, 1080 (Ohio 1996)), against "earlier statements, negotiations, or oral agreements by deeming those earlier expressions to be merged into or superseded by the written document." *Id.* (quoting Williston on Contracts (4 ed. 1999) 541-48, Section 33:1).

One corollary to the parol evidence rule is contract integration. *TRINOVA Corp. v. Pilkington Bros., P.L.C.*, 638 N.E.2d 572, 575 (Ohio 1994). An integrated contract "fully expresses the intent of the parties." *Williams v. Spitzer Autoworld Canton, L.L.C.*, 913 N.E.2d 410, 419 (Ohio 2009) (Cupp, J., concurring) (citing Black's Law Dictionary (9th ed. 2009), 880). "Contract integration provides that where the parties' intent is sought to be ascertained from several writings, a prior writing will be rejected in favor of a subsequent one if the latter writing contains the whole of the parties' agreement." *TRINOVA Corp.*, 638 N.E.2d at 575. Thus, when the latter writing "is complete and unambiguous on its face, parol evidence is inadmissible to show a contrary intent of the parties." *Id.*

As noted in *Galmish*, the parol evidence rule applies to the parties "*final* written *integration* of their agreement. . . ." *Galmish*, 734 N.E.2d at 788 (emphasis added) (quoting 11 Williston on Contracts (4th ed. 1999) 569-70, Section 33:4)). The parol evidence rule does not apply in the event of a "partial integration" in which a written agreement "does not fully express the parties' intent. . . ." *Id.* In the event of partial integration, extrinsic evidence may be

introduced to "supplement, but not . . . vary or contradict the terms" of a written agreement.

*Mishler v. Hale*, 26 N.E.3d 1260, 1270 (Ohio Ct. App. 2014).

Integration is therefore the threshold question for AWA's breach of contract counterclaim. In order to consider extrinsic evidence of the alleged maintenance-related representations made by BTL, the Court must first determine that the parties' written Program Agreement is not fully integrated.

> Integration is a rule of substantive law to be decided by the trial judge in the first instance. *See* 4 Williston on Contracts 3d (1961) 955, Section 633. The question of partial integration must be determined from the four corners of the document itself and not by a prefatory table of documents. . . . *See* 2 Restatement of the Law 2d, Contracts (1981) 117[-]118, Section 210(3).

*TRINOVA Corp.*, 638 N.E.2d at 576.

AWA highlights the following aspects of the Program Agreement that mention the term "maintenance" to demonstrate that it is *not* fully integrated:

> • Section 2 specifically refers to Bush's "maintenance program" but does not define that program. This is because Bush had already informed AWA of the content of the maintenance program through prior representations.
> • Section 3 provides that AWA is to withhold payments from the Drivers to cover payments for Bush's "financing, maintenance program or any other agreement" between Bush and the Drivers. The same section expressly incorporates a term from Bush's agreements with the Drivers relating to late fees.
> • Section 4 states that AWA has certain obligations ***upon the default by Drivers under the Drivers' agreements with Bush***. Bush and AWA thus ***cannot even determine their obligations under the Program Agreement without looking to the Drivers' agreements with Bush***.
> • Section 5 provides that AWA is required to "support[] BTL and its efforts…to keep trucks properly maintained[.]" The Program Agreement, however, does not expressly detail Bush's maintenance efforts.
> • Section 7 states that if AWA terminates the Program Agreement, "***all terms and conditions contained herein*** shall survive and ***continue to apply*** to the Delivery Vehicles, the lease agreements and the ***maintenance agreements*** that were financed by BTL…."

(AWA's Mem. in Opp'n, Doc. 19 at PAGEID 157) (emphasis in the original).

While the specific provisions cited by AWA reference a maintenance program or maintenance agreements, when read in context these terms do not show that the Program Agreement is partially integrated.  The language used by the parties does not reflect a need to reference any other alleged written or oral agreements to ascertain the parties' intent.  The Program Agreement is complete on its face and couched in terms expressing the unambiguous responsibilities and obligations of the respective parties.  For example, AWA contends that Section 2 of the Program Agreement specifically refers to BTW's "maintenance program" but does not define that program.  Section 2 states:

> Maintenance Program for Independent Contractors. So long as this Agreement is in effect between the parties and has not otherwise been terminated by either party, Sponsor [AWA] shall either (i) endorse BTL's maintenance program for all of its Independent Contractors requesting financing from BTL, or (ii) contractually require that its Independent Contractors receive written prior approval from BTL to use an alternative program for the maintenance of Delivery Vehicles during the term of each Independent Contractor's financing or leasing agreement with BTL.

(Doc. 9-5 at PAGEID 97).  AWA's obligation under this section is not dependent on a specific definition of "maintenance program."  Rather, regardless of the the quality or nature of BTL's maintenance program, AWA is required to "endorse" the program to those contractors requesting BTL financing or require, by contract, that its contractors receive written prior approval from BTL before using a non-BTL maintenance program.  Similarly, the other provisions of the Program Agreement cited by AWA that reference BTL's maintenance and maintenance program: (1) set forth *AWA's* maintenance responsibilities upon a financing-agreement default by one of its Independent Contractors, (2) reflect that any maintenance agreements *between BTL and* AWA's *Independent Contractors* were independent agreements, or (3) set forth "miscellaneous" responsibilities of the parties, including that AWA "*will educate its management team on the importance of supporting BTL* and its efforts" to keep leases current,

8

keep trucks properly maintained, and recruit new independent contractors for repossessed trucks. (*See* Doc. 9-5, PAGEID 97 at ¶¶ 2-3, PAGEID 98 at ¶ 4, PAGEID 99 at ¶¶ 5, 7). These terms of the Program Agreement do not set forth any parameters requiring that BTL provide a maintenance program of a certain quality or according to certain specifications that would necessitate review of information outside the four corners of the Program Agreement to understand the respective obligations of the parties. The obligations of the parties are clear, and the undefined term "maintenance program" does not give rise to a finding of partial integration. There is nothing within the four corners of the Program Agreement to demonstrate that it was drafted and executed with the intention of establishing or defining BTL's maintenance responsibilities. *See TRINOVA Corp.*, 638 N.E.2d at 576. Rather, BTL's obligation, "expressed by clear and unambiguous language" in the Program Agreement, *see id.* (quoting *Blosser v. Enderlin*, 148 N.E. 393, paragraph two of the syllabus (Ohio 1925)) (remaining citation omitted), was "to extend financing and/or leasing of Delivery Vehicles to one or more Independent Contractors" because AWA's business model depends on its Independent Contractors having access to Delivery Vehicles to deliver products. (Doc. 9-5 at PAGEID 97).

The primary cases relied upon by the parties illustrate the difference between partial and full integration and support the conclusion that the Program Agreement is fully integrated. In *Allied Erecting & Dismantling Co. v. Ohio Edison Co.*, No. 10-MA-25, 2011 WL 2138975 (Ohio Ct. App. May 26, 2011), a manufacturing company and utility company engaged in negotiations regarding the construction of an electrical substation, which required two transformers. *Id.* at *1. After these negotiations, the parties entered into a written agreement that covered only "the design and procurement of the two transformers required for the substation." *Id.* Although the appellant argued that the written contract "was part of an overarching agreement to design and

build a substation which was orally agreed upon[,]" *id.* at *2, the court found that the written contract regarding the transformers was "clear, unambiguous, and susceptible of only one interpretation. It was of the sale of two transformers with certain specifications for [a sum certain]." *Id.* at *5. The court therefore found the partial integration exception to the parol evidence rule inapplicable. *Id. Cf. Ctr. Ridge Ganley, Inc. v. Stinn*, 511 N.E.2d 106, 109 (Ohio 1987) (emphasis added) ("[T]he real estate agreement was *not* altogether complete on its face, but rather *its very terms indicated that it was part of a larger transaction* involving the sale of an automobile dealership.").

Like the appellant in *Allied*, AWA here relies on a theory of an overarching agreement including both the Program Agreement and the oral and written maintenance-related representations. In *Allied*, even acknowledging how interconnected the written transformer agreement and alleged oral electrical substation agreement were, the court would not disrupt the facially integrated agreement regarding only the transformers. *Allied* is distinguishable in the fact that the facially integrated agreement therein appears not to have mentioned the electrical substation at all, whereas here, the Program Agreement does reference BTL's maintenance program. References to BTL's maintenance program alone, however, do not clearly suggest a larger agreement or transaction between the parties—particularly absent any mention of conditions or qualities associated with BTL's maintenance program. *Cf. Stinn*, 511 N.E.2d at 109.

In *Mulch Mfg., Inc. v. Advanced Polymer Sols., LLC*, 947 F. Supp. 2d 841 (S.D. Ohio 2013), the court came to the opposite conclusion. Therein, a mulch company had entered into an agreement with a research and development company to develop a fire retardant for the former's product. *Id.* at 846-47. Under that agreement, the research and development company was "to

10

develop a formulation *according to [the mulch company's] specifications*"—not just any formulation. *Id.* at 860 (emphasis added). The agreement between the parties, however, did not define those specifications. *Id.* at 859. The court accordingly found the agreement only partially integrated. *Id.* at 858.

Unlike *Mulch Mfg.*, where the parties contracted for a specific product formulation of a particular quality, there is no such condition included in the four corners of the Program Agreement with respect to BTL's maintenance program that requires supplementation. The references to maintenance cited by AWA (*see* Doc. 19 at PAGEID 157) do not demonstrate that clarifying the existence and extent of BTL's maintenance program is necessary to divining the intent of the parties in executing the Program Agreement.

On the basis of the foregoing, the Court concludes that the Program Agreement is fully integrated, and AWA's allegations pertaining to the maintenance-related representations are barred by the parol evidence rule. Because the Court determines that the Program Agreement is fully integrated, it need not consider BTL's arguments on partial integration. AWA has failed to demonstrate that there is a contract between the parties other than the Program Agreement and has failed to identify any provision of the parties' Program Agreement that has been breached.[7] Accordingly, BTL's motion to dismiss should therefore be granted as to Count II of AWA's counterclaims.

### B. Fraud

BTL argues that AWA's fraud counterclaim should be dismissed on the basis that it, too, is premised on material barred by the parol evidence rule (i.e., the maintenance-related representations). In addition, BTL argues that Count II is insufficient under Rule 9(b) of the

---

[7] Because AWA does not argue that the maintenance-related representations formed an oral contract separate and apart from the Program Agreement, the Court also does not consider BTL's arguments relative thereto.

Federal Rules of Civil Procedure because AWA has not pled (1) representations, (2) that such representations were false, or (3) justifiable reliance on any representations.  BTL characterizes AWA's theories of fraud as relying on alleged representations by BTL that are based on promised future action, contingent action, or mere puffery—any of which is insufficient under Ohio law to support a claim of fraud.[8]

AWA argues in response that its fraud counterclaim is not barred by the parol evidence rule because fraud is an exception to the rule.  Extrinsic evidence is permitted where the purpose of the evidence is to show fraudulent inducement or promissory fraud related to a contract, and the parol evidence to be considered does not contradict the terms of such contract.  AWA further argues that its fraud counterclaim alleges promises by BTL that did not constitute mere puffery—namely, AWA alleges that BTL represented the existence of a maintenance program and its then-existing intent and capability to deliver such a program.  AWA also argues that it alleges with particularity BTL's false representations, who made them, when they were made, how they were communicated, and why they were false.

### 1. *Parol evidence rule*

As discussed in the integration context, there are exceptions to the parol evidence rule. Applicable to AWA's fraud counterclaim, the parol evidence rule does not "prohibit a party from introducing parol or extrinsic evidence for the purpose of proving fraudulent inducement[,]" as

---

[8] Because the Court concludes that AWA's breach of contract counterclaim fails, it need not address BTL's arguments regarding the independent duty doctrine, *see Aero Fulfillment Servs. Corp. v. Oracle Corp.*, 186 F. Supp. 3d 764, 774 (S.D. Ohio 2016) (citation omitted) ("The law prohibits a plaintiff from asserting a tort claim based upon the same actions as those that form a claim for breach of contract, unless the alleged breaching party also breaches a separate duty."), and economic loss doctrine*, see Corporex Dev. & Constr. Mgt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005) (citations omitted) ("The economic-loss rule generally prevents recovery in tort of damages for purely economic loss.").

12

such a prohibition would erode all legal protections against fraudulent dealings. *Galmish*, 734 N.E.2d at 789 (citing *Drew v. Christopher Constr. Co., Inc.*, 41 N.E.2d 1018, paragraph two of the syllabus (Ohio 1942)) (remaining citation omitted). At the same time, "an oral agreement cannot be enforced in preference to a signed writing which pertains to exactly the same subject matter, yet has different terms." *Id.* at 790 (quoting *Marion Prod. Credit Ass'n v. Cochran*, 533 N.E.2d 325, paragraph three of the syllabus (Ohio 1988)) (remaining citation omitted). *See, e.g., Forest City Mgmt., Inc. v. Int'l Total Servs., Inc.*, No. 64188, 1993 WL 526670, at *7 (Ohio Ct. App. Dec. 16, 1993) (parol evidence demonstrating an indefinite tenancy term could not be considered where the written lease specifically provided for a fixed tenancy term).

AWA also raises promissory fraud as a distinctly applicable exception to application of the parol evidence rule. Under Ohio law, promissory fraud occurs when a party "mak[es] a contractual promise with no present intention of performing it. . . ." *Coal Res., Inc. v. Gulf & W. Indus., Inc.*, 756 F.2d 443, 446 (6th Cir. 1985). In *Coal Res.*, the Sixth Circuit explained that extrinsic evidence may be used to show that, at the time the parties contracted, a party had no intention to perform the promises made and reflected in the parties' *written* agreement. *Id.* It went on to explain that where a promise is made without the intention of performing, but that promise is *not* reflected in the parties' agreement, parol evidence might be admissible if the agreement is not fully integrated; if the agreement is fully integrated, however, a party would not be permitted to introduce extrinsic evidence of a promise falling outside the subject matter of the written agreement. *Id.* at 446-47.

The Court begins with the promissory fraud issue. AWA does not allege that BTL breached a promise contained in the parties' written Program Agreement. Because the Court has concluded that the Program Agreement is fully integrated, based on the holding in *Coal Res.*,

AWA's promissory fraud theory is inapplicable to allow parol evidence of a promise not reflected in that agreement.  The Court therefore considers only the fraudulent inducement exception to the parol evidence rule.

The fraudulent inducement exception cannot apply if the Court determines that the maintenance-related representations "pertain[] to exactly the same subject matter [as the Program Agreement], yet ha[ve] different terms." *Galmish*, 734 N.E.2d at 790 (quoting *Marion Prod.*, 533 N.E.2d at paragraph three of the syllabus) (remaining citation omitted).  The Court, therefore, turns again to the terms of the Program Agreement and the content of the maintenance-related representations.

BTL characterizes AWA's counterclaims regarding the maintenance-related representations as making BTL responsible for *all* maintenance and repairs under *all* circumstances (*see* Doc. 16 at PAGEID 136, 152), which would contradict the terms of the Program Agreement dealing with maintenance in the event of a default.  (*See* Doc. 9-5, PAGEID 98 at ¶ 4).  The Court, however, does not read AWA's counterclaims to make such broad allegations.  Instead, construed in its favor, AWA's counterclaims allege that BTL represented that it had a full-service maintenance program that had the capability to provide all preventative maintenance for Independent Contractors using BTL's program.  This does not contradict the terms of the Program Agreement relating to BTL's maintenance program, which goes little beyond contemplating that BTL offered some kind of maintenance program.  Overall, the Program Agreement does not address which entity is generally responsible for maintenance outside of the default context, much less the required existence and characteristics of BTL's maintenance program—the subject of the maintenance-related representations.  *See supra* pp. 8-

9.  The maintenance-related representations therefore do not contradict the terms of the Program Agreement.

BTL also argues that the maintenance-related representations naturally should have been included in the Program Agreement, also precluding application of the fraudulent inducement exception to the parol evidence rule.  BTL relies on the concurring opinion in *Williams*, 913 N.E.2d at 419 (Ohio 2009) (Cupp, J., concurring), in which Justice Cupp describes the "collateral agreement" exception to the parol evidence rule as requiring *both* that a collateral agreement "not contradict the terms of the written agreement" *and* "be one that would naturally be omitted from the written instrument."  *Id.* (quoting *Patrick v. Ressler*, No. 04AP-149, 2005 WL 2303687, at *6 (Ohio Ct. App. Sept. 22, 2005)).  *See also Bollinger, Inc. v. Mayerson*, 689 N.E.2d 62, 69 (Ohio Ct. App. 1996) (citing *Wall v. Firelands Radiology, Inc.*, 666 N.E.2d 235, 242 (Ohio Ct. App. 1995) and *Busler v. D & H Mfg., Inc.*, 611 N.E.2d 352, 355 (Ohio Ct. App. 1992)) ("Parties may not prove fraud by claiming that the inducement to enter into an agreement was a promise that was within the scope of the integrated agreement but was ultimately not included in it.").  *But see Acad. Imaging, LLC v. Soterion Corp.*, 352 F. App'x 59, 66 (6th Cir. 2009) (quoting *Galmish*, 734 N.E.2d at 790-91) (emphasis added) ("[T]he parol evidence rule does apply . . . [u]nless the false promise is *either* independent of *or* consistent with the written instrument. . . .").

Assuming that AWA must show *both* that the extrinsic evidence (maintenance-related representations) naturally would have been omitted from the Program Agreement *and* that it does not contradict the terms of the Program Agreement, the Court finds that AWA has done both.  As to the former, this conclusion flows naturally from the Court's determination that the Program Agreement was fully integrated.

Resisting this conclusion, BTL characterizes the maintenance-related representations as consideration for AWA entering into the Program Agreement and notes that AWA elsewhere argues that these representations were part of an overall "AWA-Bush Contract." (*See* Doc. 19 at PAGEID 172). The Court does not find, however, that information related to BTL's maintenance program would naturally be included in the Program Agreement—a document that itself refers, twice, to the fact that maintenance agreements were to be *independently executed* between the Independent Contractors and BTL. (*See* Doc. 9-5, PAGEID 97 at ¶ 3 (emphasis added) ("[AWA] will withhold sufficient pro-rata portion of monies representing Independent Contractor's gross monthly obligations due BTL under . . . *maintenance program . . . agreements between BTL and each Independent Contractor*."), PAGEID 99 at ¶ 7 (emphasis added) ("The survival of terms and conditions shall extend through performance of all of the terms and conditions and the expiration by its terms of each Delivery Vehicle . . . *maintenance contract between BTL . . . and the Independent Contractors*. . . .")).

In addition, the fact that the Program Agreement mentions maintenance is not tantamount to maintenance obligations being "part and parcel" of the parties' agreement concerning Delivery Vehicle leasing and financing. *Bollinger*, 689 N.E.2d at 69 (parol evidence of a promise to provide "limitless funding" to a new company held inadmissible under fraudulent inducement exception where such a promise would have been "part and parcel" of agreements related to "all aspects" of that new company's purchase of assets from another company). The *Bollinger* court acknowledged that parol evidence may fall within the fraudulent inducement exception if "it covers a subject matter distinct from, *though closely related to*, the express subject matter of the written contract and not embodied in the written contract." *Id.* (emphasis added) (citing *Sparhawk v. Gorham*, 139 N.E.2d 652, 655 (Ohio Ct. App. 1956)). Though maintenance is

related (perhaps even "closely") to the Program Agreement's subject matter, it is distinct and therefore fits within the fraudulent inducement exception to the parol evidence rule.  *Id.*

Finally, although AWA argues in its response that the maintenance-related representations "were material to [its] *decision to sign* the Program Agreement" (Doc. 19 at PAGEID 160) (emphasis added), this is not the equivalent of such representations falling within the subject matter of the Program Agreement.  *Cf. Acad. Imaging, LLC*, 352 F. App'x at 66 (distinguishing admissible parol evidence going to the "*making of*" a contract from parol evidence going to a "*provision of*" a contract under the fraudulent inducement exception).

In sum, the Court finds that AWA's fraudulent inducement counterclaim is premised on representations both consistent with the terms and distinct from the subject matter of the Program Agreement.  The Court therefore concludes that the fraudulent inducement exception to the parol evidence rule applies to allow consideration of the maintenance-related representations.

### 2. *Heightened pleading standard for fraud*

To state a claim for fraud under Ohio law, plaintiff must allege:

> (a) a representation, or when there is a duty to disclose, concealment of fact, (b) which is material to the transaction at hand, (c) made falsely with knowledge of falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (d) with the intent of misleading another into relying upon it, (e) justifiable reliance upon the representation or concealment, and (f) a resulting injury proximately caused by the reliance.

*Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 352 (6th Cir. 2000) (quoting *Burr v. Bd. of Cnty. Comm'rs*, 491 N.E.2d 1101, 1105 (Ohio 1986)).  A party alleging fraud must plead "with particularity the circumstances constituting fraud or mistake."  *W. & S. Life Ins. Co. v. JPMorgan Chase Bank, N.A.*, 54 F. Supp. 3d 888, 899 (S.D. Ohio 2014) (quoting Fed. R. Civ. P. 9(b)) (remaining citation omitted).  This requires specifying: "1) what the fraudulent statements were, 2) who made them, 3) when and where the statements were made, and 4) why the

statements were fraudulent." *Id.* (quoting *Morris Aviation, LLC v. Diamond Aircraft Indus., Inc.*, 536 F. App'x 558, 562 (6th Cir. 2013)).

BTL first argues that AWA has not pleaded the misrepresented fact with the requisite particularity. The Court disagrees. AWA's counterclaim alleges that "[i]n October and November of 2016, [BTL] represented that it had a full-service maintenance program that, among other things, (1) included preventative, scheduled maintenance; (2) provided 24-hour support to drivers; and (3) ensured drivers would benefit from bulk-repair discounts obtained by Bush." (Doc. 9, PAGEID 45 at ¶ 4) (*see also id.* PAGEID 49 at ¶ 17 (describing representations made about the maintenance program)). The counterclaim goes on to allege that the representations were made by Michael Bush (BTL's then-president and CEO) (*see* Doc. 9 at PAGEID 46)), among others, to Jordan Georgiev (AWA's then- and current-authorized Member) (*see id.*), both orally and in writing. (*Id.*, PAGEID 46 at ¶ 11). Finally, the counterclaim provides two examples of specific emails from Mr. Bush to Mr. Georgiev related to these representations. (*Id.*, PAGEID 46-47 at ¶¶ 12-13). The Court concludes that these allegations, together, are sufficiently particular to support a claim for fraud.

BTL next argues that AWA cannot demonstrate falsity because the maintenance-related representations concerned future promises. *See Waste Mgmt., Inc. v. Danis Indus. Corp.,* No. 3:00-cv-256, 2009 WL 347773, at *28 (S.D. Ohio Feb. 10, 2009) (holding that predictions as to future events do not constitute actionable misrepresentations under Ohio law); *Tibbs v. Nat'l Homes Const. Corp.*, 369 N.E.2d 1218, 1222 (Ohio Ct. App. 1977) ("It is generally true that fraud cannot be predicated upon promises or representations relating to future actions or conduct. . . ."). The Court finds that the maintenance-related representations concern the existence (or not) of a functional maintenance program operated by BTL that offered particular features;

therefore, this fraud counterclaim does not necessarily concern any future performance, and AWA sufficiently pleads falsity. (*See also* Doc. 9, PAGEID 45 at ¶¶ 4-5) ("[BTL] represented that it had a full-service maintenance program. . . . These representations were false. . . .").

BTL's argument otherwise focuses on a single phrase in AWA's counterclaim: that AWA relied on BTL's "factual representations that it had a full-service maintenance program and *would perform* [various services on Independent Contractors' Delivery Vehicles]. . . ." (*Id.*, PAGEID 49 at ¶ 20). The Court finds that the overarching allegation in the counterclaim is that BTL represented that it *had* "a full-service maintenance program" when, in fact, it did not operate such a maintenance program—as evidenced, for example, by BTL's insufficient staffing levels. (*See id.*, PAGEID 51 at ¶ 25).

BTL finally argues that AWA's fraud counterclaim is based on mere opinions and puffery that cannot support justifiable reliance. "A statement of opinion or belief such as occurs in 'puffing' generally cannot constitute a misrepresentation." *Miami Valley Paper, LLC v. Lebbing Eng'g & Consulting Gmbh*, No. 1:05-cv-00702, 2009 WL 818618, at *12 (S.D. Ohio Mar. 26, 2009) (quoting *Kondrat v. Morris*, 692 N.E.2d 246, 252 (Ohio Ct. App. 1997)). BTL highlights various statements in the counterclaim concerning the alleged substance of BTL's maintenance program, e.g., "the most competitive prices[,]" a "network of maintenance and repair coverage" that "continues to grow[,]" and "proactive communication" about needed maintenance, and argues that these are vague advertising claims upon which AWA could not have justifiably relied. (Doc. 9, PAGEID 47-48). The Court finds, however, that BTL glosses over the much more detailed services that it purported to specifically cover and which were targeted directly at AWA. (*See id.*, PAGEID 46-47 at ¶ 13) (describing, e.g., "All Preventative Maintenance . . . All repairs . . . Tire replacements & alignments . . . 24 Hour Emergency Road

19

Service. . . .”); (*see also* Doc. 9-2) (BTL's maintenance program guide designed specifically for

AWA). *Cf. Bryant v. Walt Sweeney Auto., Inc.*, Nos. C-010395, C-010404, 2002 WL 1071943,

at *5 (Ohio Ct. App. May 13, 2002) (a misrepresentation in an advertisement for a particular

vehicle that the vehicle had had only one prior owner was sufficient to state a claim for fraud).

To the extent that BTL argues that AWA's reliance was otherwise not justifiable, the Court finds

that this question is one of fact and therefore weighs in AWA's favor for purposes of the present

motion. *See Amerifirst Sav. Bank of Xenia v. Krug*, 737 N.E.2d 68, 87 (Ohio Ct. App. 1999)

(quoting *Crown Prop. Dev., Inc. v. Omega Oil Co.*, 681 N.E.2d 1343, 1349 (Ohio Ct. App.

1996)) (“The question of justifiable reliance is one of fact and requires an inquiry into the

relationship between the parties.”).  (*See also* Doc. 9, PAGEID 45 at ¶ 6, PAGEID 51 at ¶ 27)

(AWA's counterclaim allegations regarding its justifiable reliance on the maintenance-related

representations).

The Court concludes that AWA's fraudulent inducement counterclaim, though based on

evidence extrinsic to the Program Agreement, falls within an exception to the parol evidence

rule.  The Court further concludes that AWA's fraudulent inducement counterclaim meets the

heightened pleading standard applicable to fraud claims.  BTL's motion to dismiss should be

denied as to Count I of AWA's counterclaims.

C.  Unjust enrichment

AWA alleges in this counterclaim that BTL's failure to follow through on its

maintenance-related promises caused the Independent Contractors to spend thousands of hours

off the road.  During that time, the Independent Contractors still owed BTL money pursuant to

independent leases and Delivery Vehicle maintenance contracts.  In order to keep generating

revenue, AWA was forced to “advance [its Independent Contractors] funds to pay for their leases

and for repairs" that "in turn, were paid to [BTL]."  (Doc. 9, PAGEID 53 at ¶¶ 38-39).  AWA alleges that retention by BTL of these advanced funds constitutes unjust enrichment.

First, BTL argues that AWA's unjust enrichment claim must fail because the Program Agreement covers BTL's maintenance program, AWA's unjust enrichment claim is premised on BTL's failure to provide such a program, and AWA is precluded using equitable means to recover contractual damages.  Second, BTL argues that AWA did not allege that it conferred any *direct* benefit on BTL or that BTL had knowledge of that benefit—both necessary elements of an unjust enrichment claim under Ohio law.  Any benefit that AWA conferred, BTL argues, was indirect and in the form of a funding advance to AWA's Independent Contractors that was thereafter paid to BTL by the Independent Contractors for leases and repairs.

AWA argues in response that it is permitted to plead unjust enrichment in the alternative to its breach of contract claim because it has alleged fraud.  AWA also argues that it "made the subject payments directly to [BTL]."  (Doc. 19 at PAGEID 174) (citing the Program Agreement (Doc. 9-5, PAGEID 97-98 at ¶ 3), which in turn describes the process by which AWA agreed to withhold funds owed to BTL by Independent Contractors under the independent maintenance, financing, or other agreements between the latter two).[9]

To state an unjust enrichment claim under Ohio law, a complaint must allege: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment."  *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 684 F. Supp. 2d 942, 951 (N.D. Ohio 2009) (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1302 (Ohio 1984)).  An unjust enrichment claim cannot encompass a matter that is the

---

[9] BTL also argues that AWA cannot plead unjust enrichment in the alternative without a valid fraud claim, but this argument is mooted by the Court's conclusion above.  *See supra* p. 18.

subject of an express contract between two parties.  *See Great Water Cap. Partners, L.L.C. v. Down-Lite Int'l, Inc.*, Nos. C-150015, C-150023, 2015 WL 7459284, at *4 (Ohio Ct. App. Nov. 18, 2015) (citation omitted).  In addition, the purpose of an unjust enrichment claim is not to compensate any loss or damage suffered by a plaintiff but instead *only* to compensate "the benefit [a plaintiff] has conferred on the defendant." *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005) (quoting *Hughes v. Oberholtzer*, 123 N.E.2d 393, 397 (Ohio 1954)).  To assert a common law unjust enrichment claim, a claimant must "establish[] that a benefit ha[s] been conferred upon that defendant by [that claimant]."  *Id.*

Because the Court has concluded that the Program Agreement does not encompass BTL's maintenance program, the Court is not persuaded by BTL's first argument.  Moreover, even if the Court were to conclude that AWA's unjust enrichment claim fell within the subject matter of the Program Agreement, it has already determined that AWA has sufficiently pleaded a fraudulent inducement claim, and an unjust enrichment claim "may be maintained despite the existence of an express contract where there is evidence of fraud, bad faith, or illegality." *Gascho v. Glob. Fitness Holdings, LLC*, 863 F. Supp. 2d 677, 699 (S.D. Ohio 2012) (citing *Res. Title Agency, Inc. v. Morreale Real Est. Servs., Inc.*, 314 F. Supp. 2d 763, 772 (N.D. Ohio 2004)); *see also Ice v. Hobby Lobby Stores, Inc.*, No. 1:14-cv-744, 2016 WL 10489843, at *2 (N.D. Ohio Aug. 30, 2016) (affirming denial of judgment on the pleadings regarding the plaintiff's unjust enrichment claim where the plaintiff had also alleged that a contract was procured through in illusory and deceptive discount offer).

AWA alleges that it "advance[d] [its Independent Contractors] funds to pay for their leases and for repairs" that, in turn, "were paid to [BTL]."  (Doc. 9, PAGEID 53 at ¶¶ 38-39). AWA alleges that these advances were necessary because BTL's "fail[ure] to provide the

22

promised maintenance program" left AWA's Independent Contractors "off the road" for "thousands of hours" and "unable to generate revenue. . . ." (*Id.* at ¶¶ 37-38).   In its response, AWA gives more context to these allegations, referring to the portion of the Program Agreement that sets forth AWA's promises to (1) withhold its Independent Contractors' wages in an amount necessary to cover the Independent Contractors' obligations under "financing, maintenance program or other agreements" with BTL and (2) "remit such payments *directly* to BTL. . . ." (Doc. 9-5, PAGEID 97 at ¶ 3) (emphasis added).  With this context, the Court understands AWA to allege that it *directly* advanced to BTL to satisfy the amounts that the Independent Contractors owed BTL under their separate maintenance agreements.

BTL cites two cases in support of its position that the benefit allegedly conferred here is too indirect to support a claim for unjust enrichment: *Microsoft*, 834 N.E.2d 791, and *Liberty Mut. Ins. Co. v. Three-C Body Shop, Inc.*, No. 19AP-775, 2020 WL 2042916 (Ohio Ct. App. April 28, 2020), *appeal not allowed*, 150 N.E.3d 960 (Ohio 2020).  In *Microsoft*, the Supreme Court of Ohio held that the purchaser of a computer from a third-party retailer, which contained software distributed to that retailer by Microsoft, could not bring an unjust enrichment claim against Microsoft.  834 N.E.2d at 793, 799.  The court emphasized that "no economic transaction occurred between [the plaintiff purchaser] and Microsoft," which foreclosed the finding of a benefit conferred by the plaintiff to Microsoft to which Microsoft was not justly entitled.  *Id.* at 799 (citing *Keco Indus., Inc. v. Cincinnati & Suburban Bell Tel. Co.*, 141 N.E.2d 465, 467 (Ohio 1957)).

In *Liberty Mut.*, a collision repair shop filed a counterclaim against a car insurance company for unjust enrichment based on prior underpayments by the car insurance company for repairs made for the car insurance company's insureds.  *Liberty Mut.*, 2020 WL 2042916, at *1.

Under its contracts with insureds, the car insurance company was required to pay for reasonable and necessary repairs.  *Id.* at *3.  The collision repair shop argued that when it made repairs, the car insurance company received the benefit of having its "contractual legal duty . . . to its insured" satisfied.  *Id.*  The court concluded, however, that any benefit the collision shop conferred on the car insurance company was "merely an incidental consequence of [the collision repair shop's] agreements with its customers to repair their vehicles.  [The collision repair shop] did not repair the vehicles to satisfy [the car insurance company's] contracts but to satisfy its own contracts with the vehicle owners."  *Id.* at *4.

This case presents a different factual scenario from both *Microsoft* and *Liberty Mut.*  Given the payments AWA made to BTL for maintenance on behalf of its Independent Contractors, the connection between AWA and BTL is much less attenuated than that between the computer purchaser and software distributor in *Microsoft*.  Unlike *Liberty Mut.*, where the collision repair shop acted based on its independent duties to third-party vehicle owners, *see Liberty Mut.*, 2020 WL 2042916, at *4, BTL does not point to a separate agreement between AWA and its Independent Contractors upon which AWA based its payments to BTL.  Construing the allegations of the counterclaim in AWA's favor (including the attached Program Agreement), neither case compels a finding that the alleged benefit conferred here was too indirect.

In two other cases discussing the concept of direct versus indirect benefit in the context of the first element of an unjust enrichment claim under Ohio law, federal district courts within the Sixth Circuit have found that a narrowly defined direct benefit is not a prerequisite to application of the doctrine.  In *Gorsuch v. OneWest Bank, FSB*, No. 3:14-cv-152, 2015 WL 2384110 (N.D. Ohio May 19, 2015), the court found that the plaintiff borrower adequately

alleged unjust enrichment where she was required to assume additional debt on her loan for flood insurance, even though it was her mortgage servicer that actually advanced the cost of the flood insurance on her behalf. *Id.* at *8. The court concluded that the plaintiff had adequately alleged unjust enrichment where she was the "ultimate source" of the premiums and "bore the costs of benefits retained" by the defendant. *Id.* Construing the counterclaim allegations in AWA's favor, AWA may have ultimately borne the cost associated with advancing funds to its Independent Contractors. It is that ultimate cost burden on which the case turned in *Gorsuch.*

In *Randleman v. Fid. Nat. Title Ins. Co.*, 465 F. Supp. 2d 812 (N.D. Ohio 2006), the homeowner plaintiffs sued the defendant title insurance provider for charging premiums in excess of those allowed under Ohio law. *Id.* at 816. The plaintiffs were not insured by the defendant; instead, the plaintiffs' lender had obtained the title insurance from the defendant. *Id.* Nevertheless, the court concluded that the plaintiffs had adequately alleged unjust enrichment because they alleged that they "paid premiums for the purchase of title insurance from defendant in connection with a refinance transaction[,]" which showed a "transactional nexus between plaintiffs and defendant" that distinguished the facts at bar from *Microsoft*, among other cases. *Id.* at 825 (quoting the plaintiffs' complaint).

Neither *Microsoft* nor *Liberty Mut.* are sufficiently factually similar to the facts at bar to convince the Court that the alleged benefit conferred to BTL by AWA was too indirect to satisfy the first element of an unjust enrichment claim as a matter of law. Moreover, both *Gorsuch* and *Randleman* suggest that unjust enrichment claims may survive a motion to dismiss provided that there are allegations of out-of-pocket losses and some transactional relationship between a plaintiff and defendant. On the whole, the Court finds that AWA has sufficiently alleged that it

conferred a benefit on BTL for purposes of the first unjust enrichment claim element under Ohio law.

BTL also argues that AWA's counterclaim makes no allegation whatsoever regarding BTL's knowledge of a benefit conferred by AWA. AWA argues in response that BTL's receipt of the funds advanced is sufficient to demonstrate knowledge, and BTL was put on notice of the benefit received via its unjust enrichment counterclaim. Neither party cites authority for its position.

The knowledge element of an unjust enrichment claim does not appear to be frequently litigated. In *Parmater v. Internet Brands, Inc.*, No. 14AP-391, 2015 WL 329635 (Ohio Ct. App. Jan. 27, 2017), the court provided some discussion of this element. Therein, the plaintiff had been a minority shareholder in a company that owned and operated a website. *Id.* at *1. The plaintiff was removed from that company's board and executive position in 2002, and the secretary of state later canceled the company. *Id.* The company's majority shareholder subsequently formed a new company that continued to operate the website without the plaintiff's involvement. *Id.* That new company ultimately sold the website to the defendant in 2008, and the plaintiff sued the defendant for unjust enrichment. *Id.* The court granted summary judgment to the defendant on the plaintiff's unjust enrichment claim because there was no indication that the defendant had any reason to know about the plaintiff's involvement with the website over six years ago or that the plaintiff conferred any benefit upon him. *Id.* at *6.

The court in *Roberts v. McCoy*, 88 N.E.3d 422 (Ohio Ct. App. 2017), also gives some guidance on the question of knowledge. Therein, the court granted summary judgment to the defendant seller on the plaintiff homebuyer's unjust enrichment claim based on the inflated purchase price of the property at issue. *Id.* at 430. The plaintiff argued that several issues should

26

have been, but were not, disclosed prior to sale. *Id.* The court concluded that the buyer "failed to demonstrate that [the seller] had knowledge of any inaccuracies within the Disclosure Form" and therefore "failed to demonstrate that [the seller] had knowledge of any benefit conferred upon her that would require compensation for [the buyer] in equity." *Id.* at 431.

The Court finds each of these cases distinguishable and concludes that AWA has sufficiently pleaded BTL's knowledge of a benefit conferred on it by AWA. By virtue of paragraph 3 of the Program Agreement, BTL knew that AWA would serve as a conduit for independent maintenance program payments owed by the Independent Contractors to BTL. Construing the allegations of the counterclaim in AWA's favor, BTL's receipt of such payments in accordance with the terms of the Program Agreement is sufficient to plausibly state the knowledge element of AWA's unjust enrichment claim. As such, the Court finds that AWA has sufficiently pleaded the second element of its unjust enrichment claim and concludes that BTL's motion to dismiss Count III of AWA's counterclaims should be denied at this stage of the proceedings.

### D. Ohio's Deceptive Trade Practices Act

BTL argues that AWA, an Illinois company, does not have standing to bring a claim under the Ohio Deceptive Trade Practices Act (ODTPA), Ohio Rev. Code § 4165.01 *et seq.*, relying primarily on *Loreto v. Procter & Gamble Co.*, 737 F. Supp. 2d 909 (S.D. Ohio 2010), *aff'd in part and rev'd in part on other grounds*, 515 F. App'x 576 (6th Cir. 2013). BTL also argues that, even if AWA had standing, it fails to plausibly allege that BTL made false statements that actually or had the tendency to deceive for purposes of the statute and, instead, alleges non-actionable puffery.

AWA argues in response that *Loreto* is not only *not* dispositive on non-Ohio-resident standing under the ODTPA but that another federal court within the Sixth Circuit has allowed non-Ohio-resident plaintiffs to sue under the ODTPA.  AWA refutes BTL's substantive argument by reference to its arguments made in connection with its fraud claim.

       1.   *Standing*

The ODTPA states that "[a] person who is injured by a person who commits a deceptive trade practice . . . may commence a civil action to recover actual damages from the person who commits the deceptive trade practice."  Ohio Rev. Code § 4165.03(A)(2).  The ODTPA defines "person" as including limited liability companies, such as AWA.  *Id.* at § 4165.01(D).  The statute does not address residency.

BTL unduly stretches the holding of *Loreto* as precluding non-resident standing.  In *Loreto*, the court concluded that the out-of-state plaintiffs could not bring claims under the ODTPA because the *only* connection to Ohio was the fact that the defendant was headquartered in Ohio.  737 F. Supp. 2d 909, 916-17.  By contrast, while not explicitly addressing whether a party's out-of-state residence precluded standing, the court in *Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618, 621, 634 (S.D. Ohio 2014) allowed Kentucky residents to pursue ODTPA claims.  *See also Rui He v. Rom*, No. 15-cv-1869, 2016 WL 5682012, at *1, 4 (N.D. Ohio Oct. 3, 2016) (allowing Chinese citizens to sue under the ODTPA).  BTL identifies no other case law or statutory provision limiting standing under the ODTPA to Ohio residents.  Moreover, AWA's connection with Ohio is distinguishable from the plaintiffs in *Loreto*: AWA conducts business in Ohio, BTL is an Ohio Corporation, and the parties agreed that Ohio law would govern the Program Agreement.  *Loreto* distinguishable and does not establish a per se

rule limiting standing under the ODTPA to Ohio residents. Therefore, the Court finds that AWA

has standing to bring an ODTPA claim and turns to BTL's substantive argument.

> 2. *Actually deceive or tendency to deceive*

The parties do not appear to dispute the following formulation of the elements of an

ODTPA claim:

> (1) a false statement or statement which is misleading; (2) which statement
> actually deceived or has the tendency to deceive a substantial segment of the
> target audience; (3) the deception is material in that it is likely to influence a
> purchasing decision; and [(4)]the plaintiff has been or is likely to be injured as a
> result.

*Craven v. Aultman Coll. of Nursing & Health Scis.*, No. 2011-ca-00022, 2011 WL 4499307, at

*5 (Ohio Ct. App. Sept. 26, 2011). In addition, "[w]here claims are made under the Ohio

common law and [the ODTPA], Ohio courts are to apply essentially the same analysis as that

applied in assessing the law of unfair competition under the federal statutes."[10] *Aero Fulfillment*

*Servs. Corp.*, 186 F. Supp. 3d at 778 (quoting *Best v. AT & T Mobility, LLC*, No. 1:12-cv-564,

2015 WL 1125539, at *7 (S.D. Ohio Mar. 12, 2015)) (footnote omitted discussing the

applicability of the analysis under the Lanham Act to ODTPA claims).

BTL argues that AWA fails to sufficiently plead element two because BTL's

maintenance representations were "at most puffery" that cannot deceive or tend to deceive.

(Doc. 16 at PAGEID 152). "Mere puffing, advertising that is not deceptive for no one would

---

[10] The Sixth Circuit has set out nearly identical elements for a claim under the Lanham Act to those identified in *Craven*:

> 1) the defendant has made false or misleading statements of fact concerning his own product or
> another's; 2) the statement actually or tends to deceive a substantial portion of the intended
> audience; 3) the statement is material in that it will likely influence the deceived consumer's
> purchasing decisions; 4) the advertisements were introduced into interstate commerce; and 5) there
> is some causal link between the challenged statements and harm to the plaintiff.

*Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc.*, 185 F.3d
606, 613 (6th Cir. 1999) (citation omitted).

rely on its exaggerated claims, is not actionable. . . ." *Cincinnati Sub-Zero Prods., Inc. v. Augustine Med., Inc.*, 800 F. Supp. 1549, 1551 (S.D. Ohio 1992) (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990)) (construing the Lanham Act), *abrogated on other grounds by Balance Dynamics Corp. v. Schmitt Indus., Inc.*, 204 F.3d 683, 697-98 (6th Cir. 2000).  In *Cincinnati Sub-Zero Prods.*, the court held that the plaintiff had shown a likelihood of success on the merits of its ODTPA claims because the defendant's advertisements used thermographic images that "misrepresent[ed] or mislead[]" the intended purchaser and did not "accurately portray" the product's effectiveness.  *Id.* at 1558.  *But see, e.g., Interactive Prods. Corp. v. a2z Mobile Off. Sols., Inc.*, 326 F.3d 687, 699-700 (6th Cir. 2003) (calling a product "redesigned" or "improved" is an opinion that is not actionable); *Collins Inkjet Corp. v. Eastman Kodak Co.*, No. 1:13-cv-664, 2014 WL 11516553, at *13 (S.D Ohio Mar. 31, 2014) (press releases stating that defendant's customers received the "highest levels" of "optimized system performance" or "optimal printing performance" constituted imprecise and subjective puffery or opinion) (citing *Interactive Prods.*, 326 F.3d at 699-700); *Outdoor Techs., Inc. v. Vinyl Visions, LLC*, No. 1:06-cv-044, 2006 WL 2849782, at *4 (S.D. Ohio Sept. 29, 2006) (brochure statements that a product was the "most weatherable" with the "strongest warranty" were mere subjective puffery).

When construed in AWA's favor, the counterclaim sufficiently alleges statements by BTL beyond mere puffery.  AWA's counterclaim alleges that the maintenance-related representations deceived or had a tendency to deceive.  For example, AWA alleges that BTL represented that it had a full-service maintenance program (*see* Doc. 9, PAGEID 49 at ¶ 20), which included all preventative maintenance, breakdown repairs, and 24/7 emergency road service (*see id.*, PAGEID 46 at ¶ 12).  AWA alleges that these representations were false and

BTL knew they were false when they were made (*see id.*, PAGEID 50 at ¶ 21, PAGEID 51 at ¶ 25). These alleged statements go beyond opinion, "blustering or subjective boasting" and describe specific features about an offered program. *Outdoor Techs.*, 2006 WL 2849782, at *4 (citation omitted). The Court finds that these statements are not mere puffery and Count IV of AWA's counterclaims should therefore not be dismissed at this stage of the proceeding.

**IT IS THEREFORE RECOMMENDED THAT** BTL's motion to dismiss (Doc. 16) be **GRANTED** as to Count II of AWA's counterclaim (breach of contract) and **DENIED** as to Counts I (fraud), III (unjust enrichment), and IV (ODTPA).


Date: 7/26/2021

Karen L. Litkovitz
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

BUSH TRUCK LEASING, INC.,                         Case No. 1:20-cv-511
      Plaintiff,                                          Dlott, J.
                                                          Litkovitz, M.J.
      vs.

ALL WAYS AUTO TRANSPORT, LLC,                     **REPORT AND**
      Defendant.                                          **RECOMMENDATION**

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations.   This period may be extended further by the Court on

timely motion for an extension.  Such objections shall specify the portions of the Report objected

to and shall be accompanied by a memorandum of law in support of the objections.  If the Report

and Recommendation is based in whole or in part upon matters occurring on the record at an oral

hearing, the objecting party shall promptly arrange for the transcription of the record, or such

portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the

assigned District Judge otherwise directs.  A party may respond to another party's objections

**WITHIN 14 DAYS** after being served with a copy thereof.  Failure to make objections in

accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140

(1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).