# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION

| | |
|---|---|
| BUSH TRUCK LEASING, INC., <br>     Plaintiff, <br><br> vs. <br><br> ALL WAYS AUTO TRANSPORT, LLC, <br>     Defendant. | Case No. 1:20-cv-511 <br> Dlott, J. <br> Litkovitz, M.J. <br><br><br> **ORDER** |

This matter is before the Court on non-party Dickinson Fleet Services, LLC's (Dickinson's)[1] motion to quash subpoena (Doc. 125), defendant All Ways Auto Transport, LLC's (AWA's) response (Doc. 126), and Dickinson's reply (Doc. 130). AWA has also filed a motion for leave to file excess pages. (Doc. 132).

### I.    Background

Plaintiff Bush Truck Leasing, Inc. (BTL) and AWA entered into a Program Agreement in 2016. (*See* Doc. 9-5 (Program Agreement)). BTL finances and leases vehicles for business purposes to independent contractors; and AWA uses a network of independent contractor truckers to deliver products to its customers. (*Id.* at PAGEID 97). In 2019, Dickinson entered into an agreement with BTL "for purposes of providing services to [BTL]'s fleet of trucks, whereby Dickinson would charge [BTL] pursuant to the terms of this agreement." (Doc. 125 at PAGEID 1238).

In July of 2020, BTL sued AWA for breach of the Program Agreement with an alternative claim for unjust enrichment. (*See generally* Doc. 1). AWA filed counterclaims, including breach of contract, fraud, unjust enrichment, and violations of the Ohio Deceptive

---

[1] AWA notes, and Dickinson does not contest, that Dickinson was acquired by Cox Automotive in 2021 and now does business under that name. (*See* Doc. 126 at PAGEID 1298 n.3).

Trade Practices Act.. (*See generally* Doc. 9).² The District Judge granted BTL's motion to dismiss AWA's breach of contract claim; but AWA's fraud, unjust enrichment, and Ohio Deceptive Trade Practices Act claims remain. (*See* Doc. 46).

AWA alleges that prior to entering into the Program Agreement, BTL promised that it had a maintenance program that included preventative, scheduled maintenance; 24-hour support to drivers; and the benefit of BTL's bulk repair discounts through BTL's vendors. (Doc. 9 at PAGEID 45 and 49, ¶¶ 4 and 17). After it entered into the Program Agreement with BTL, AWA alleges that its drivers could not get a hold of BTL outside of normal business hours for repair and maintenances issues, BTL did not perform basic preventative maintenance, and BTL failed to pass along bulk discounts. (*See id.* at PAGEID 50, ¶¶ 21-23). Instead of discounting repairs, plaintiff alleges that Dickinson (on behalf of BTL) inflated invoices. (*Id.*, ¶ 24). AWA further alleges that it had to advance funds to BTL to satisfy its drivers' lease and repair costs necessitated by BTL's failure to provide the maintenance program and discounts it promised. (*See id.* at PAGEID 53, ¶¶ 37-39; Doc. 9-5 at PAGIED 97, ¶ 3 (provision of Program Agreement stating that AWA would remit these funds directly to BTL)).

Dickinson has already produced documents to AWA in this lawsuit. AWA issued a subpoena *duces tecum* in September 2021 (Doc. 48), which resulted in the eventual production of over 500 documents in June 2022. (King Decl., Doc. 125-3 at PAGEID 1274, ¶ 6). In September 2023, AWA circulated a deposition notice to Dickinson. In November 2023, Dickinson and AWA conferred regarding the topics. On December 5, 2023, AWA sent Dickinson a revised notice that contained the same topics with some revisions. (Ex. 6 to Corcoran Decl., Doc. 127-1 at PAGEID 1428-30). At a February 13, 2024 informal discovery

---

² AWA subsequently amended its answer but not its counterclaim. (*See* Doc. 71 at PAGEID 649 n.2).

conference, the Court directed the parties to continue to meet and confer to resolve their issues. (*See* February 13, 2024 docket notation). On February 26, 2024, the parties conferred again without success. On March 13, 2024, AWA served the revised subpoena (*see* Doc. 123). Dickinson's motion to quash (Doc. 125) followed.

    II.    **Legal standard**

Federal Rule of Civil Procedure 26 permits parties to obtain discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case. . . ." Fed. R. Civ. P. 26(b)(1). Rule 45 of the Federal Rules of Civil Procedure governs non-party subpoenas. *Riccardi v. Jackson*, No. 2:21-cv-211, 2021 WL 4272065, at *2 (S.D. Ohio Sept. 21, 2021). This Rule "permits parties in legal proceedings to command a non-party to . . . produce documents. . . ." *Id.* (citing Fed. R. Civ. P. 45(a)(1)). A non-party subpoena, however, is "subject to the same discovery limitations as those set out in Rule 26." *State Farm Mut. Auto. Ins. Co. v. Physiomatrix, Inc.*, No. 12-cv-11500, 2013 WL 10936871, at *3 (E.D. Mich. Nov. 26, 2013) (quoting *United States v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14155, 2012 WL 4513600, at *5 (E.D. Mich. Oct. 1, 2012)).

Upon a timely motion to quash, a court "must quash or modify a subpoena that . . . subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3)(A)(iv). A court "may . . . quash or modify [a] subpoena if it requires . . . disclosing a trade secret or other confidential research, development, or commercial information. . . ." Fed. R. Civ. P. 45(d)(3)(B)(i). In addition, Rule 30(b)(6) of the Federal Rules of Civil Procedure requires that a subpoena directed to an organization "describe with reasonable particularity the matters for examination." Fed. R. Civ. P. 30(b)(6). Because it seeks to quash the subpoena, Dickinson "bears the ultimate burden of proof." *Meyer v. Bank of Am., N.A.*, No. 2:18-cv-218, 2018 WL 6436268, at *2 (S.D. Ohio Dec.

3

7, 2018) (quoting *Hendricks v. Total Quality Logistics, LLC*, 275 F.R.D. 251, 253 (S.D. Ohio 2011)).[3]

### III. Motion for leave to file excess pages

Dickinson argues that the Court should strike the last six pages of AWA's 26-page response (Doc. 126) for failing to abide by the undersigned's Standing Order, which provides that "**[b]riefs and/or memoranda in support of or in opposition to any motion in this court shall not exceed twenty pages unless a party first obtains leave of court.**" Magistrate Judge Litkovitz's Standing Order on Civil Procedures, § I.G. AWA has since filed a motion seeking such leave—explaining that it needed six additional pages to fully address Dickinson's arguments. (Doc. 132).

Though it exceeded the page limitation, AWA's response complied with the undersigned's requirements upon the granting of leave to file additional pages, which are:

> (1) a table of contents indicating the main sections of the memorandum, the arguments made in each section, and the pages on which each section and subsection may be found; and (2) a succinct, clear, and accurate summary not to exceed five pages of the principal arguments made and citations to the primary authorities relied upon in the memorandum.

Magistrate Judge Litkovitz's Standing Order on Civil Procedures, § I.G. Dickinson has already responded to the motion, and therefore it does not appear that it will suffer any prejudice from granting AWA's request. Under these circumstances, the Court **GRANTS** AWA's motion (Doc. 132).

### IV. Analysis

---

[3] "If the discovery sought appears 'relevant on its face, the party resisting the discovery has the burden to establish the lack of relevance'. . . ." *Hendricks*, 275 F.R.D. at 253 (quoting *Transcor, Inc. v. Furney Charters, Inc.*, 212 F.R.D. 588, 591 (D. Kan. 2003)). The Court has already determined, as an initial matter, that "Dickinson's corporate representative's testimony is relevant to an adjudication of this dispute on its full merits." (Doc. 105 at PAGEID 1016).

A. The subpoena

AWA's March 2024 subpoena to Dickinson lists the following topics:

1. For May 1, 2019 to July 29, 2022, the number of dedicated mobile technicians employed by Dickinson and the number of mobile service trucks operated by Dickinson.

2. For May 1, 2019 to July 29, 2022, the number of full-service shops operated by Dickinson.

3. For May 1, 2019 to July 29, 2022, the types of maintenance-related documentation Dickinson generated and retained relating to the Trucks.

4. For May 1, 2019 to July 29, 2022, Dickinson's procedure for informing drivers of the need for preventative maintenance of the Trucks.

5. The negotiations relating to the Dickinson Fleet Services Maintenance Select Plus Agreement ("Dickinson Agreement"), the representations made by Dickinson in connection with the Dickinson Agreement, and the terms of the Dickinson Agreement.

6. For May 1, 2019 to July 29, 2022, Dickinson's process for negotiating discounts and rebates from its vendors, its process for applying those discounts and paying those rebates, and the Master Discount Agreement between Loves Travel Stops & Country Stores, Inc. and Dickinson.

7. For May 1, 2019 to July 29, 2022, Dickinson's process for receiving estimates and invoices from vendors and creation of invoices for drivers of the Trucks.

8. The All Ways Service Request and Invoice for Subpoena spreadsheet produced by Dickinson in response to All Ways Auto's subpoena;

9. For May 1, 2019 to July 29, 2022, Dickinson's retention of estimates and invoices received from vendors that performed maintenance or repairs on the Trucks[.]

(Doc. 123 at PAGEID 1228-29 (footnote one omitted, which referenced an attached spreadsheet identifying the "Trucks" in issue)).

B. Arguments

Dickinson argues that four separate reasons justify quashing AWA's subpoena. First, compliance would subject Dickinson to an undue burden. *See* Rule 45(d)(3)(A)(iv). Second,

5

AWA's subpoena requires the disclosure of trade secrets and/or confidential information. *See* Fed. R. Civ. P. 45(d)(3)(B)(i). Third, AWA's subpoena does not satisfy the particularity requirement of Rule 30(b)(6). Fourth, AWA's deposition topics seek information beyond the scope of Rule 26.[4]

As discussed below, the Sixth Circuit considers both the breadth and particularity of deposition topics as part of its undue burden analysis under Rule 45(d)(3)(A)(iv), and those considerations are substantially similar to the relevant portions of Rules 26 and 30(b)(6) relied on by Dickinson. Because Dickinson's arguments overlap considerably between undue burden and Rules 26 and 30(b)(6), the Court finds it unnecessary to address the latter two arguments separately.

1. *Undue burden*

"Undue burden is to be assessed in a case-specific manner considering 'such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burden imposed.'" *In re: Mod. Plastics Corp.*, 890 F.3d 244, 251 (6th Cir. 2018) (quoting *Am. Elec. Power Co., Inc. v. United States*, 191 F.R.D. 132, 136 (S.D. Ohio 1999)). In assessing these factors, courts are to "balance the need for discovery against the burden imposed on the person ordered to produce documents" while taking into account whether the person is a party. *Id.* (quoting *Am. Elec. Power Co.*, 191 F.R.D. at 136). A non-party seeking to quash a subpoena "cannot rely on a mere assertion that compliance would be burdensome and onerous without

---

[4] Dickinson also footnotes a potential argument about this Court's exercise of personal jurisdiction over it. (Doc. 125 at PAGEID 1237 n.1). Dickinson does not develop this argument further in either the balance of its motion to quash or its reply memorandum, and the Court therefore does not consider it. (*See* Doc. 130 at PAGEID 1444-45). *See McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (quoting *Citizens Awareness Network, Inc. v. U.S. Nuclear Regulatory Comm'n*, 59 F.3d 284, 293-94 (1st Cir. 1995)) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.").

showing the manner and extent of the burden and the injurious consequences of insisting upon compliance with the subpoena." 9A Wright & Miller, Federal Practice and Procedure, § 2463.1 (3d ed. April 2023 Update).

a. *Relevance*[5]

Dickinson appears to concede that topics 3 and 8 are relevant to this case but argues that topics 1, 2, 4, 5, 6, 7, and 9 are not. Topics 1 and 2 ask for the number of mobile technicians, mobile service trucks, and full-service shops employed and operated by Dickinson; and Dickinson argues that the only relevant information in this litigation is what *BTL represented* about these things. AWA argues that it has claimed that BTL's false representations about a maintenance program caused it damages, and these topics are designed to determine whether Bush's representations were accurate.

Dickinson fails to demonstrate that topics 1 and 2 are irrelevant. AWA's unjust enrichment claim is premised on allegations that it advanced funds to BTL on behalf of its drivers for repairs resulting, in part, from inadequate maintenance. While Dickinson's *2019-2022* maintenance capabilities are not relevant to whether BTL, in *2016*, fraudulently induced AWA to enter into the Program Agreement, whether BTL sustained its maintenance program could be relevant to the parties' unjust enrichment claims.

Topic 4 asks whether Dickinson had a procedure for informing drivers about the need for preventative maintenance. Dickinson argues that it had no contractual obligation to AWA, and this information is therefore irrelevant. AWA argues that it is necessary to confirm Dickinson's position, as BTL's subcontracted maintenance provider, on whether it had such a procedure. For the same reason as topics 1 and 2, Dickinson fails to demonstrate that topic 4 is irrelevant.

---

[5] The Court does not discuss the "need of the party for the documents" consideration separately because Dickinson states that its arguments on this and relevance are the same. (*See* Doc. 125 at PAGEID 1246).

7

Topic 5 requests the negotiations relating to, representations made in connection with, and terms of the contract between Dickinson and BTL.  Dickinson argues that this contract is not at issue, and, in any event, the contract speaks for itself.  AWA argues that this topic is relevant because it may demonstrate that BTL agreed to let Dickinson mark-up invoices to AWA drivers despite BTL's prior representation to AWA that it would pass along negotiated bulk discounts.

Topic 5 is not relevant.  In its response, AWA argues that "the Dickinson-[BTL] agreement is relevant because that agreement purports to allow Dickinson to mark-up invoices to AWA's drivers.  [BTL] thus entered into an agreement that precluded it from honoring its representations to AWA."  (Doc. 126 at PAGEID 1304).  The Court agrees that the agreement *itself* is relevant, but the Court does not find that BTL and Dickinson's negotiations or representations made prior to the execution of that contract are relevant.

Topic 6 relates to discounts and rebates Dickinson had with its vendors, and a Master Discount Agreement between Dickinson and one particular vendor: Loves Travel Stops & Country Stores, Inc. (Loves).  Dickinson argues that this seeks information from its vendors—all nonparties—and that the Loves agreement in particular had to do with a completely different part of Dickinson's business than Dickinson's business with BTL.  AWA argues that it "has uncovered at least one Dickinson discount agreement with terms that are squarely at odds with [BTL]'s representation that it would pass along bulk discounts to AWA's drivers."  (Doc. 126 at PAGEID 1304).

Dickinson fails to demonstrate that topic 6 is irrelevant.  Dickinson argues that how it handles discounts and rebates with other vendors and its Master Discount Agreement with Loves relate to a different area of their business, but it is not clear to the Court that this distinction makes a difference to the question of relevance.  If Dickinson obtained discounts and rebates

8

from its vendors, but it was not permitted to pass along those discounts in other aspects of its business (i.e., those that affected AWA's drivers), it would be relevant to unjust enrichment claims.

Topic 7 relates to Dickinson's process for receiving estimates and invoices from vendors and creation of invoices for drivers of the Trucks in issue. Again, Dickinson argues that this does not relate to the relationship between BTL and AWA and that its invoice creation and retention policies are not at issue. AWA argues that it has alleged in its counterclaim that Dickinson marked up repair invoices while acting as BTL's agent.

Dickinson fails to demonstrate that topic 7 is irrelevant. AWA alleges that Dickinson sent repair invoices on behalf of Bush. If those invoices were inflated as compared to the actual costs of the services, it would be relevant to unjust enrichment claims.

Finally, topic 9 seeks information about Dickinson's retention policy for estimates and invoices from vendors that did repairs on AWA trucks. Dickinson argues that its retention policies are not at issue in this litigation. AWA argues that the extent or existence of a retention policy bears on whether BTL (via Dickinson) fraudulently or deceptively marked up invoices. For the reasons explained with respect to topic 7, the Court finds that this information is relevant.

b. *Breadth*[6]

Dickinson argues that topics 1, 2, and 3 include "general, vague, undefined terms ('dedicated mobile technicians, ' mobile-service trucks,' 'full service shops,' and 'maintenance-related documentation'). . . ." (Doc. 125 at PAGEID 1246). AWA argues that this is disingenuous, because BTL represented in its discovery responses that the first three of these terms were provided by Dickinson itself. AWA argues that if that is not true, Dickinson's

---

[6] Dickinson largely restates its arguments on breadth in its discussion of the particularity of the topics, and the Court therefore does not address the particularity factor separately. (*See* Doc. 125 at PAGEID 1247-48).

corporate representative can testify as such. In addition, AWA argues that current and former versions of Dickinson's own website reflect substantially similar terms. (*See* Doc. 127-1 at PAGEID 1386-87).

The Court is not persuaded that Dickinson would be unable to prepare a Rule 30(b)(6) witness to testify about the terms used in topics 1, 2, and 3 on account of their breadth. It is evident that AWA seeks information about services that are now or have been represented on Dickinson's own website—regardless of minor differences between the verbiage on the website and those in topics 1 and 2. As for topic 3, the Court does not find it unreasonable to require a corporate representative to testify on the overall types of vehicle maintenance documentation Dickinson regularly generated and retained in its ordinary course of its business. Understood as such, topic 3 is not overbroad.

Dickinson argues that topics 4, 7, and 9 are overbroad because they seek information about the 89 Trucks, and Dickinson "has no control over who uses the Trucks, where the Trucks go, and who is the driver of the Truck" after their lease to BTL and then to AWA. (Doc. 125 at PAGEID 1246). AWA explains that these topics do not seek detailed information pertaining to each of the Trucks but rather "high-level information" regarding Dickinson policies on notifying drivers about preventative maintenance, receiving estimates and invoices and then creating its own invoices, and retention of estimates and invoices that should not vary from driver to driver or truck to truck. (Doc. 126 at PAGEID 1307).

With AWA's clarification that topics 4, 7, and 9 do not seek specific information as to each driver of the Trucks at issue, the Court does not find them overly broad. It is reasonable to ask a corporate representative about if/how the company generally handled preventative maintenance notifications (topic 4) and repair estimates and invoicing (topic 7), and whether the

10

company had a retention policy for estimates and invoices/what such policy was (topic 9). Understood as such, topics 4, 7, and 9 are not impermissibly broad.

Dickinson argues that topic 6, regarding discounts and rebates Dickinson had with its vendors and the Master Discount Agreement between Dickinson and Loves, is overly broad because it would require information on "company-wide business practices with no limiting provision, requiring research into multiple departments." (Doc. 125 at PAGEID 1246). AWA argues that it seeks high-level information about how Dickinson handles discounts and rebates with other vendors and whether it can pass along such discounts. AWA argues that the declaration statement by Dickinson's Senior Director of Internal Operations Management offered to support the overbreadth of this topic does not specifically reference topic 6. (*See* Doc. 125-2 at PAGEID 1269).

Dickinson's supporting declaration says only that the topics, generally, require information "from multiple individuals and different departments within the company. . . ." (Doc. 125-2 at PAGEID 1269, ¶ 11). Aside from this highly general statement, Dickinson fails to cite authority to persuade the Court that requiring a corporate representative to prepare using information from multiple departments necessarily means that deposition topics are overbroad. To the contrary, the Court expects that a corporate representative may often be required to testify about multiple departments.

Dickinson argues that topic 8 is overbroad because it solicits testimony about a spreadsheet including thousands of data points without referencing any particular data on which AWA seeks testimony. AWA argues in response that it will ask about "how the spreadsheet was prepared" and "what the spreadsheet reflects, etc." (Doc. 126 at PAGEID 1308). In reply,

11

Dickinson concedes that AWA may ask how the spreadsheet was prepared, but a component seeking information on what the spreadsheet reflects is overly broad.

If the parties agree that the corporate representative can testify as to how the spreadsheet was prepared, it is reasonable to expect that the corporate representative could also learn and be able to share the types/sources of data from which the spreadsheet is comprised. Understood as such, and *not* as requiring the corporate representative to be able to speak specifically about each data point on the spreadsheet, this element of topic 8 is not overly broad.

Finally, Dickinson relies on *Heselton v. Espinoza*, No. 21-cv-1592, 2023 WL 167093, at *3 (S.D. Ill. Jan. 12, 2023) to support its position that topics 3, 4, 7, 8, and 9 are overbroad. *Heselton* lends little support to Dickinson's position. As that court explained, it quashed a third-party subpoena that requested "documents and communications related to **all**" of one of defendant's insurer's "underwriting files and insurance policies" when the underlying lawsuit consisted of "straightforward negligence and *respondent superior* claims" arising from a single car accident. *Id.* at *3. This is not analogous to the allegations at bar.

                    c. *Time period*

A temporal limitation does not apply to topic 8 (the spreadsheet Dickinson produced to AWA in discovery). Dickinson argues that the remaining topics cover a 27-month period (May 1, 2019-July 29, 2022) that is unreasonable given the scope of its operations and the fact that much of the information covered by the topics changes periodically (e.g., company procedures). AWA argues that Dickinson has not supplied specifics as to why this time period causes an undue burden. AWA also argues that it is not attempting to pinpoint specific figures (e.g., in the context of the number of mobile technicians); rather, it is looking for approximate figures. As it

relates to company policies and procedures, AWA argues that Dickinson has not explained why these things would change over an approximately three-year period.

The 27-month time period is reasonable. Dickinson relies on the declaration of its Senior Director of Internal Operations Management, who states that "[t]he exact number, make up, and configuration of available services and those technicians available to provide those services varies day to day." (Doc. 125-2 at PAGEID 1268, ¶ 6). This statement relates to topics 1 and 2, but the declarant says nothing to support Dickinson's position that the information covered by the remaining topics would fluctuate over time. As explained above, topics 3, 4, 6, 7, and 9 are aimed at obtaining overarching company policies/procedures during the specified period. If there were no such overarching company policies/procedures during the time, the corporate representative can testify as such. If there were, the Court expects that a corporate representative could testify generally to these policies/procedures on these topics and any significant changes thereto. The declaration offered in support of Dickinson's motion does not persuade the Court otherwise. (*See* Doc. 125-2).

d. *Burden*

On this factor, Dickinson incorporates its previous arguments. AWA cites *Equal Emp. Opportunity Comm'n v. Ferrellgas, L.P.*, 97 F.4th 338 (6th Cir. 2024), and argues that the burden of production must be considered along with a non-party's size and resources. *See id.* at 350 ("Assessing whether the burden of compliance is undue is a comparative exercise; what is unduly burdensome to a small business with a handful of employees may not be unduly burdensome to a Fortune 500 company."). AWA also cites *Am. Mun. Power, Inc. v. Voith Hydro, Inc.*, No. 2:17-cv-708, 2023 WL 3624783 (S.D. Ohio May 24, 2023), arguing that Dickinson participated in BTL's fraud, and it therefore is an interested party with a financial or

reputational stake in the outcome of this lawsuit. *See id.* at *10 (quoting *Culliver v. Ctr. for Toxicology & Env't Health LLC*, No. 3:21-cv-4942, 2022 WL 475185, at *4 (N.D. Fla. Feb. 16, 2022)) (noting that courts have defined an interested non-party as "an entity that does not have an actionable right at issue in the litigation, but has a significant, underlying connection to the case and, typically, some sort of financial or reputational stake in the litigation's outcome.").[7] Finally, AWA cites *Sterling Merch. Inc. v. Nestle, S.A.*, No. 06-1015, 2008 WL 1767092, at *1 (D. P.R. Apr. 15, 2008) and argues that the high dollar amounts of the alleged damages (on both sides) and importance of the issues involved justify imposing a substantial burden on a non-party. *See id.* at *1 (citing *U.S. v. International Business Machines Corp.*, 83 F.R.D. 97, 109 (S.D. N.Y. 1979)) ("It has been long recognized that a substantial burden may be justified by the nature and importance of the inquiry involved.").

In its reply memorandum, Dickinson argues that it is not an interested party because it does not have a contractual relationship with AWA. Dickinson argues that the Court need not reach AWA's arguments about comparative resources and the importance of the issues in the lawsuit because the subpoena violates Rules 26, 30(b)(6), and 45(d).

Dickinson does not support its position that a party's status as "interested" turns on the existence of a contractual relationship with any legal authority. Given that AWA alleges in its counterclaims that Dickinson sent its drivers inflated invoices, the Court finds that Dickinson is not entirely disinterested. The Court also finds it appropriate to consider the size of Dickinson's operations as it weighs the burden it imposes—a burden that Dickinson fails, in any event, to

---

[7] In its reply memorandum, Dickinson argues that the *Voith Hydro* court ultimately shifted part of the costs of compliance to the subpoenaing party even though it found that the non-party was unquestionably interested in the suit. (*See* Doc. 130 at PAGEID 1444). The *Voith Hydro* court, however, was considering millions of dollars in compliance related expenses—i.e., "significant expense" as contemplated by Rule 45(d)(2)(B)(ii). Dickinson does not argue that it would incur such significant expense; indeed, it cites no particulars at all on its costs of compliance at all.

14

meaningfully articulate. Overall, the burden factor weighs in AWA's favor.

In sum, Dickinson has failed to demonstrate that complying with AWA's subpoena would subject it to an undue burden under Rule 45(d)(3)(A)(iv) with the exception of topic 5, and subject to the following modifications:

> Topic 3: For May 1, 2019 to July 29, 2022, the overall types of vehicle maintenance documentation Dickinson regularly generated and retained in the ordinary course of its business.
>
> Topic 4: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable procedure for informing drivers of the need for preventative maintenance, if any.
>
> Topic 7: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable process for receiving estimates and invoices from vendors and creation of invoices for drivers, if any.
>
> Topic 8: How the All Ways Service Request and Invoice for Subpoena spreadsheet produced by Dickinson in response to All Ways Auto's subpoena was prepared and the types/sources of data used to create it.
>
> Topic 9: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable retention policy for estimates and invoices received from vendors that performed maintenance or repairs on its behalf, if any.

2. *Trade secrets/confidential information*

Dickinson argues that customer pricing is considered a trade secret under Ohio and Indiana law, and contract negotiations are considered trade secrets under Indiana law. Dickinson argues that the protective order is insufficient to protect its interests and that an attorney-eyes only (AEO) provision is necessary. In response, AWA argues that it has no objection to adding an AEO provision to the protective order but reserves the right to object to the designation at a later time. Dickinson attaches a proposed amended protective order with its reply.

Given AWA and Dickinson's apparent agreement that the addition of an AEO provision is appropriate, the Court will grant BTL leave to address, within 5 days and in writing, whether it

15

objects to the entry of the amended protective order submitted by Dickinson.

### C. Attorney fees and costs

Dickinson argues that it is entitled to attorney fees and expenses as a sanction against AWA for failing to take reasonable steps to avoid undue burden or expense. *See* Fed. R. Civ. P. 45(d)(1) ("A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court . . . must enforce this duty and impose an appropriate sanction--which may include . . . reasonable attorney's fees. . . ."). Because the Court finds that the subpoena does not impose an undue burden on Dickinson, this Rule is inapplicable.

AWA argues that the Court may impose sanctions in the event of an unsuccessful motion to quash. The cases AWA cites to support this position, however, are distinguishable. In *Wells Fargo Bank, NA v. Carnago*, No. 09-11249, 2012 WL 1205666 (E.D. Mich. Apr. 11, 2012), the court had issued a judgment and award of attorney fees and costs against two defendants in excess of $2,000,000.00. *Id.* at *1. The plaintiffs subsequently served subpoenas on those defendants for creditor's examinations, and the defendants filed a frivolous motion to quash. *Id.* at *3. Under those circumstances, the court held that "the filing of a motion to quash a subpoena does not insulate a party from sanctions where the motion to quash is frivolous." *Id.* While unsuccessful, Dickinson's motion was not frivolous. The two other out-of-circuit cases that AWA cites for this position also turn on the existence of frivolous or similar conduct. *See MGA Ent., Inc. v. Nat'l Prod. Ltd.*, No. CV10-07083, 2012 WL 12883974, at *7 (C.D. Cal. Jan. 19, 2012) (collecting cases sanctioning unsuccessful proponents of motions to quash that were late, frivolous, reckless, or in bad faith); *Am. Seeds, LLC v. Watson*, No. CIV. 10-1012, 2010 WL 3843002, at *2 (D. S.D. Sept. 27, 2010) (awarding the subpoenaing party reasonable attorney's

fees when the subpoenaed party filed a "late frivolous motion to quash").

### V. Conclusion

1. Dickinson's motion to quash (Doc. 125) is **GRANTED in part** and **DENIED in part** subject to following modifications of the subpoena:

<u>Topic 3</u>: For May 1, 2019 to July 29, 2022, the overall types of vehicle maintenance documentation Dickinson regularly generated and retained in the ordinary course of its business.

<u>Topic 4</u>: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable procedure for informing drivers of the need for preventative maintenance, if any.

<u>Topic 5</u>: DELETED

<u>Topic 7</u>: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable process for receiving estimates and invoices from vendors and creation of invoices for drivers, if any.

<u>Topic 8</u>: How the All Ways Service Request and Invoice for Subpoena spreadsheet produced by Dickinson in response to All Ways Auto's subpoena was prepared and the types/sources of data used to create it.

<u>Topic 9</u>: For May 1, 2019 to July 29, 2022, Dickinson's high-level, generally applicable retention policy for estimates and invoices received from vendors that performed maintenance or repairs on its behalf, if any.

2. This Order and the amended protective order submitted by Dickinson (Doc. 130-1) shall go into effect **5 DAYS** from the entry of this Order absent objection by BTL to entry of the amended protective order (Doc. 130-1) during such time.

**IT IS SO ORDERED.**

Date: 5/29/2024

Karen L. Litkovitz
United States Magistrate Judge